Filed 9/9/13  In re T.T. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re T. T., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E057720 |
| Plaintiff and Respondent, | (Super.Ct.No. SWJ1100174) |
| v. | OPINION |
| C. T., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  John M. Monterosso, Judge.  Affirmed.

Rich Pfeiffer, under appointment by the Court of Appeal, for Defendant and Appellant.

Pamela J. Walls, County Counsel, and Julie Koons Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

1

C. T. appeals an order terminating her parental rights and freeing her son, T. T., for adoption. She contends that the juvenile court abused its discretion by denying her a hearing on her petition for modification of the order terminating services, that she was denied due process at the hearing on termination of her parental rights, and that the court should have found that the beneficial parental relationship exception to the preference for adoption applies.

We will affirm the judgment.

FACTUAL AND PROCEDURAL HISTORY

On March 14, 2011, the Riverside County Department of Public Social Services (DPSS) received a referral concerning C. T.'s six-year-old daughter, P. T. C. T. had been arrested on February 18, 2011, for criminal threats to a neighbor, and was apparently unable to locate P. T. upon her release from custody. C. T. had told the officer who arrested her that she wanted P. T. to go to the home of her cousin, who lived in the same apartment complex. However, the cousin gave the child to another relative, who gave her to another relative, who gave her to her alleged father, S. J. P. T. was eventually located at the home of her father's cousin in San Bernardino County. She was taken to a police department and was retrieved by DPSS. C. T. had taken two-year-old T. T. to his aunt and uncle's house the day before she was arrested. She had picked him up on March 11, 2011.

The social worker went to C. T.'s apartment on March 14 accompanied by two Hemet police officers. The home was in reasonably good condition and T. T. appeared well cared for. C. T. explained the basis for the criminal threats charge. She informed

2

the social worker that she was on probation, apparently as a result of an arrest in September 2007 for attempted kidnapping, assault with a deadly weapon, great bodily injury, and "grand criminal threats." She had told police that she had been involved in some domestic violence during her relationship with S. J.

C. T. told the social worker that she had been diagnosed with bipolar disorder when she was 23. She said she had graduated from Mental Health Court in January 2011. Upon being asked to show the social worker her medications, C. T. produced a bag from a "top shelf" in her bedroom. The bag contained numerous pills, "not in any sort of labeled, child proof container." C. T. said she knew what each pill was, that she did not need all them, but kept them "in case someone else might need them." In response to the social worker's concern that the pills were accessible to the children, C. T. stated that her children "are very smart and know better." She also stated that she was unemployed and kept the children under constant supervision.

When C. T. dumped the contents of the bag onto the floor, the social worker and the police officers could see checks and an identification card that did not belong to C. T. C. T. said she did not know why they were in her bag or where they had come from. The officer verified that submission to searches was a term of C. T.'s probation and searched the apartment. He discovered another check made out to someone other than C. T. or a relative and endorsed by someone other than C. T. or a relative. C. T. said that she and a family member found the check in an ATM machine in Ontario around Christmas. She said she thought the ATM machine was "talking to her," and when she went to see if it was, she found the check. She took the check home to show everyone. She had forgotten

3

that it was in the apartment.  The police officer verified that the check was stolen and placed her under arrest.[1]

P. T. told the social worker that she was taught to hide if the police came to the house.  She said that T. T. would get "whoopins" and would get "popped in the mouth" and hit with a belt with his pants down if he misbehaved.  She said her mother had a lot of pills.  P. T. described how to roll "weed" into a "blunt," but attributed this knowledge to her observations at her father's house.  P. T. said she took care of T. T. "all the time."

On March 16, 2011, a Welfare and Institutions Code[2] section 300 petition was filed as to both children.[3]  The children were ordered detained on March 17, 2011, and were placed together in a foster home.

P. T. was in kindergarten, but because of sporadic school attendance, she was a year behind in reading and other skills.  T. T. appeared to have a speech impediment or delay, but he was able to clearly articulate a variety of curse words.  He attempted to lock the foster mother out of the house several times.  He also attempted to bite his sister and other foster children.

---

[1]  The officer verified that one checkbook and a debit card belonged to a cousin who knew that C. T. had them.  Other checks and checkbooks found in the apartment might have belonged to relatives of C. T.  That was undetermined as of the date of her arrest.

[2]  All further statutory citations refer to the Welfare and Institutions Code.

[3]  The children have different fathers.  P. T. was ultimately returned to the custody of her father and the dependency was dismissed as to her.  She is not a party to this appeal.

C. T. had mental health issues for which she took medication. She also had a significant problem with anger management. Her belligerence had resulted in conflicts with neighbors and several arrests and convictions, including assault with a deadly weapon, attempted kidnapping and vandalism. She was also belligerent and oppositional with DPSS staff, and her behavior often disrupted visits with the children. However, after several weeks of consistent visitation, C. T. became more cooperative and appeared to be "settling down."

On May 24, 2011, the juvenile court found that P. T. came within section 300, subdivision (b), and that T. T. came within section 300, subdivisions (b) and (g).[4] It was ascertained that the children are not Indian children, and the juvenile court found that the Indian Child Welfare Act does not apply. Reunification services were ordered for C. T., including parenting education, individual therapy, anger management and a psychological evaluation. The court authorized unsupervised visits for C. T. "upon 30 days of positive behavior during visits."

On October 25, 2011, both children were placed in the home of T. T.'s paternal grandmother. The following day, P. T. was placed with her father.

In its report prepared for the six-month review hearing, DPSS recommended termination of C. T.'s reunification services and setting a hearing on termination of parental rights as to T. T., pursuant to section 366.26. On October 11, 2011, C. T. had

---

[4] The whereabouts of T. T.'s father were unknown when the petition was filed. He was later located in federal prison in Lompoc. DPSS tried unsuccessfully to contact him concerning the dependency proceedings. Services were not provided to him.

pleaded guilty to felony vandalism and battery on a spouse or cohabitant and was placed on formal probation with the condition that she serve 540 days in local custody. Before being incarcerated, she had participated in some of her case plan services but had not completed any of them. At the hearing, however, the court ordered continued reunification services for C. T.

By the time of the 12-month review hearing, DPSS again recommended termination of services. T. T. was having serious behavioral problems and was in therapy. He had been diagnosed with attention deficit/hyperactivity disorder and had exhibited a "high frequency of intense aggressiveness, poor boundaries, impulsiveness, poor socialization, mood swings with violent acts[,] and nightmares." In preschool, T. T. had trouble sitting, listening and following classroom rules. He was disruptive in class, and he would spit on staff members and attempt to bite them when he became angry. He did well when he received individual attention but became angry and wanted to leave when he was not receiving that attention. His teacher reported that his behavior became worse after a visit with his mother at the jail. He was also aggressive with other children.

While C. T. was in custody, visits with the children did not go well. The social worker observed that C. T. interacted with P. T. far more than with T. T. and that she treated P. T. more as a peer than as a child. P. T. made many rude comments which C. T. ignored and the two of them gossiped about family members. She made no effort to redirect either of the children when they behaved inappropriately. When the social worker discussed these interactions with C. T. after the children had left, C. T. said she

6

believed that her children should be able to talk to her about anything, without filters. After the visit the children fought with each other in the car.

C. T. was released from custody on April 27, 2012. The social worker had told her that she needed to contact DPSS after her release to schedule a visit because DPSS did not know where she would be residing and would be unable to contact her until she provided contact information. On May 1, C. T. contacted the social worker. They agreed to set up a visit during that week. The social worker told C. T. she would call her with the date and time and would mail her a bus pass. The social worker called C. T. back on May 1, May 3, May 7 and May 15, but each time C. T.'s voicemail was full and she could not leave a message. She saw C. T. in court at a hearing to terminate P. T.'s dependency, and they agreed to arrange a visit during the following week. It was difficult to make arrangements because T. T. was living in Altadena and C. T. was living in Hemet. The travel was difficult both for C. T. and T. T. C. T. failed to return calls about visits, or failed to appear at scheduled visits without prior notification. She did not call DPSS to attempt to arrange for visits. In fact, since her release, she participated in only one visit with the children, and the quality of the visit was poor. C. T. made few attempts to redirect the children, engaged in inappropriate conversation with P. T. and became upset when the social worker intervened. T. T. "began to express anger, agitation and aggression during and following" the visit.

T. T.'s therapist recommended against returning him to C. T.'s care because he believed doing so would sabotage the improvements in T. T.'s behavior. T. T. was almost expelled from preschool because of his behavior following the last visit. C. T.'s

7

therapist believed that she would be able to regain custody of her children, but that she needed more time to work on issues such as impulsivity and "black and white thinking." T. T.'s grandmother was willing to adopt him if reunification failed.

At the review hearing, the social worker testified that C. T. had done a "wonderful job" participating in her services. She had learned to control her aggressiveness. However, because she had not taken advantage of visitation as an opportunity to practice parenting techniques, DPSS could not determine whether C. T. had actually benefitted from the services she had received. If she had made the effort, she could have had 15 visits since her release from custody.

Although the hearing was termed a 12-month review, in reality only a month remained in the maximum 18-month reunification period. The social worker testified that if they had an additional six months available for C. T. to demonstrate good parenting skills and to prepare T. T. for returning to her custody, reunification would be possible. A month, however, was simply not enough time. The social worker wanted to watch T. T. with his mother, see "what seems to trigger his behaviors with her, address it with his therapist, have his therapist address it with him in therapy, have grandma talk to him." This was not something that could be accomplished in a one-month period of marathon visitation.

The court stated that if five or six months remained in the reunification period, it would have extended services. However, because there simply was not enough time remaining and T. T. could not safely be returned home, the court terminated services. It

set a section 366.26 hearing.  The court informed C. T. of her writ rights.[5]  The court left C. T.'s visitation in place, as long as she confirmed that she would attend each visit.

C. T. filed a petition pursuant to section 388 for modification of the order terminating her parental rights.  The court denied the petition without a hearing, finding that it did not state a prima facie case.  C. T. did not object to DPSS's evidence in support of termination of her parental rights.  She presented affirmative evidence directed solely toward the beneficial parental relationship exception to the statutory preference for adoption.  The court found T. T. adoptable, that an adoptive home was available, and that adoption was in his best interest.  It found the exception inapplicable.  The court terminated parental rights and ordered T. T. placed for adoption.

C. T. filed a timely notice of appeal.

DISCUSSION

1.

THE COURT DID NOT ABUSE ITS DISCRETION WITH RESPECT TO THE

SECTION 388 PETITION

C. T. filed a petition, pursuant to section 388, seeking reinstatement of reunification services.  In support of her petition, she stated that she had completed her case plan and had visited T. T. regularly and that T. T. would benefit from reinstatement of reunification services because "[t]he child and mother are bonded and there is no risk to him if placed with her."

---

[5] C. T. did not file a writ petition to challenge the order setting the section 366.26 hearing.

9

On the date set for the section 366.26 hearing, C. T.'s attorney asked the court to trail the section 388 petition for a day or two so that she could subpoena the social workers who had supervised visits with T. T. since the termination of her reunification services. The attorney told the court that the report for the section 366.26 hearing did not include descriptions of the visits in the delivered services log. She wanted to subpoena the workers and to have them and C. T. testify as to the "nature and quality of those visits." She reminded the court that at the prior hearing, C. T. was "days away" from completing her anger management and parenting classes and that the major issue which resulted in termination of services was that C. T. did not visit regularly with T. T. Counsel stated that her client believed that with a continuance, she could produce evidence that her visits since the termination of services were "of such a quality that it would show it's in the child's best interest to grant the 388." DPSS responded that mother had "missed the visit in September and the visit was canceled in November."[6] The juvenile court denied the petition without holding an evidentiary hearing, stating that mother had failed to make a prima facie showing that reinstating reunification would be in T. T.'s best interest. C. T. now contends that this was an abuse of discretion.

A juvenile court has discretion whether to provide a hearing on a petition alleging changed circumstances. However, the petition must be liberally construed in favor of its sufficiency, and if the parent makes a prima facie showing both that changed circumstances warrant modification and that the modification will be in the child's best

---

[6] Services were terminated on August 15, 2012. The section 388 petition was denied on December 13, 2012.

interest, the court must afford the petitioner a full hearing. "Indeed, to be entitled to a hearing on her petition, appellant needed only to show 'probable cause'; she was not required to establish a probability of prevailing on her petition. [Citations.]" (*In re Aljamie D.* (2000) 84 Cal.App.4th 424, 431-432.)

Here, the court did not abuse its discretion. The evidence at the prior hearing showed both that mother missed many visits with T. T. and that she did not develop her parenting skills during the reunification period sufficiently to progress to unsupervised or overnight visits, or even to visits outside the DPSS office. The social worker who observed visits since the prior reporting period testified that C. T. had great difficulty redirecting both children and that she was very passive with them. Moreover, C. T. was very passive about setting up visits with T. T. and did not actively seek to schedule visits. Since her release from custody, mother had attended only one visit with T. T. The social worker explained that frequent visitation was necessary because T. T. had serious emotional difficulties and because his behavior was negatively affected by visits with C. T. She wanted to watch him with his mother, see "what seems to trigger his behaviors with her, address it with his therapist, have his therapist address it with him in therapy, have grandma talk to him." This was not something that could be accomplished without regular visitation. Because of the insufficient visitation, the social worker could not tell if C. T. had truly benefitted from the services she received. These were the major reasons that the court terminated services, finding that mother had not taken advantage of visitation sufficiently to practice and improve her parenting skills.

11

Nothing in her section 388 petition or in the offer of proof concerning the requested continuance constituted a prima facie showing that if a hearing were held, C. T. would be able to show that her subsequent participation in visitation had enabled her to improve her parenting to the extent that she was capable of unsupervised or overnight visits. The most she offered to show was that she had visited T. T. regularly since the order terminating her reunification services and had "good visits," and that if she could subpoena the social workers who supervised her visits, they would dispute the statement in the current report that she spent an excessive amount of time on the phone during visits. The fact that the visits went better than the current report indicated is not sufficient to make a prima facie showing either that circumstances had changed or that reinstating reunification services would be in T. T.'s best interest, and the vague offer of proof as to what the social workers could say if they were subpoenaed was also not sufficient to mandate a continuance. Moreover, as the court noted, C. T.'s statement in the petition that she had a bond with T. T. and that he would not be at risk in her care is not sufficient to make a prima facie showing that resuming services would be in T. T.'s best interest.

For these reasons, we conclude that the juvenile court did not abuse its discretion either by denying C. T. a hearing on her petition or by denying the requested continuance.

2.

## C. T. WAS NOT DENIED DUE PROCESS

C. T.'s second argument bears the caption "Mother was denied due process at the section 366.26 hearing when the department failed to report favorable evidence or include favorable service logs in its report." The argument itself is rambling and unfocussed and, contrary to the caption, it is not limited to discussion of the alleged denial of due process at the section 366.26 hearing.

We need not address arguments not germane to the issue stated in the caption. (See Cal. Rules of Court, rule 8.204(a)(1)(B).) With respect to the issue stated in the caption, however, we can readily conclude that DPSS's failure to include favorable information in its report did not deprive C. T. of due process. As C. T. notes in her opening brief, due process is satisfied if the parent has an opportunity to challenge the accuracy of the report, either by cross-examining the social worker who prepared the report or by presenting affirmative evidence. (See *In re Malinda S.* (1990) 51 Cal.3d 368, 379, 382, superseded in part by statute as noted in *In re Cindy L.* (1997) 17 Cal.4th 15, 22, fn. 3.) The social worker who prepared the report was present and could have been cross-examined. Or, C. T. could have presented affirmative evidence controverting the report. Instead, C. T. chose not to object to the report and not to cross-examine the social worker, and instead presented evidence limited to the applicability of the beneficial parental relationship exception to the statutory preference for adoption. (We discuss this exception in § 3, below.)

13

C. T. also contends that the court's denial of her continuance request violated her right to due process because it deprived her of the opportunity to contest DPSS's evidence that her visitation was sporadic and not beneficial to T. T. She contends that because there is no proof of service on her or her attorney, the logical inference is that the report was provided to her and her attorney only on the hearing date. However, C. T.'s attorney did not tell the court that she needed a continuance because she had only belatedly received the report. Rather, she merely asked for a continuance so she could subpoena witnesses she had been unable to contact "over the lunch hour." When she renewed her request for a continuance, the only further explanation she offered was that C. T. misunderstood the nature of the hearing, i.e., termination of parental rights, and thought the purpose of the hearing was so that she could see if she could get increased visitation. She now wanted to subpoena the two social workers because they could provide information "that the visits [were] of such a quality that it would show it's in the child's best interest to grant the 388." She did not offer any additional justification for the continuance for purposes of the section 366.26 hearing. Consequently, the court's denial of the continuance did not deprive C. T. of due process with respect to either the section 388 petition or the section 366.26 hearing.

C. T. also contends that the social worker's report was not admissible because it "appeared to not be reliable" because it was contrary to her testimony concerning the number and quality of the visits. However, at the hearing, her attorney expressly stated that she had no objection to the report. Consequently, any objection to its admissibility has been waived.

14

3.

MOTHER DID NOT MEET HER BURDEN OF PROOF WITH RESPECT TO THE

BENEFICIAL PARENTAL RELATIONSHIP EXCEPTION

"Adoption must be selected as the permanent plan for an adoptable child and parental rights terminated unless the court finds 'a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances:  [¶]  (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship. . . .'  (§ 366.26, subd. (c)(1)(B).)"  (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314 (*Bailey J.*).) Under these provisions, "the court must order adoption and its necessary consequence, termination of parental rights, unless one of the specified circumstances provides a *compelling* reason for finding that termination of parental rights would be detrimental to the child.  The specified statutory circumstances . . . 'must be considered in view of the legislative preference for adoption when reunification efforts have failed.'"  (*In re Celine R.* (2003) 31 Cal.4th 45, 53, italics added (*Celine R.*).)  "'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.'"  (*Ibid.*)

The parent has the burden of establishing by a preponderance of the evidence that a statutory exception to adoption applies.  (*Bailey J.*, *supra*, 189 Cal.App.4th at p. 1314.) To meet the burden of proving the section 366.26, subdivision (c)(1)(B)(i), exception the parent must show more than frequent and loving contact, an emotional bond with the

child, or pleasant visits—the parent must show that he or she occupies a parental role in the life of the child. (*In re I. W.* (2009) 180 Cal.App.4th 1517, 1527.)

A juvenile court's finding that the beneficial parental relationship exception does not apply is reviewed under a hybrid substantial evidence/abuse of discretion standard. The factual finding, i.e., whether a beneficial parental relationship exists, is reviewed for substantial evidence, while the court's determination that the relationship does not constitute a "compelling reason" (*Celine R.*, *supra*, 31 Cal.4th at p. 53) for determining that termination of parental rights would be detrimental is reviewed for abuse of discretion. (*Bailey J.*, *supra*, 189 Cal.App.4th at pp. 1314-1315.)

Since the proponent of the exception bears the burden of producing evidence of the existence of a beneficial parental or sibling relationship, a challenge to a juvenile court's finding that there is no beneficial relationship amounts to a contention that the "undisputed facts lead to only one conclusion." (*In re I. W.*, *supra*, 180 Cal.App.4th at p. 1529.) Unless the undisputed facts established the existence of a beneficial relationship, a substantial evidence challenge to this component of the juvenile court's determination cannot succeed. (*Bailey J.*, *supra*, 189 Cal.App.4th at p. 1314.)

Here, C. T. has utterly failed to show that the evidence compels the conclusion that T. T. would suffer great detriment from the termination of parental rights. Rather, she merely cites the evidence which shows that she had a loving relationship with T. T. and that she visited him and spoke to him frequently by telephone. She dismisses as irrelevant the evidence that she was never able to obtain unsupervised visits or adequately parent T. T. during her visits. However, that evidence supports the conclusion that C. T.

16

did not occupy a parental role in T. T.'s life.  Because the evidence does not lead only to the conclusion that the exception applies, C. T. did not meet her burden, and the juvenile court did not abuse its discretion in finding the exception inapplicable.  (*In re I. W.*, *supra*, 180 Cal.App.4th at p. 1529.)

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER          
Acting P.J.

We concur:

RICHLI          
J.

KING          
J.